------------------------------------------------------------------x
                                     :

In re                                 :
                                 :      **Chapter 11**

**HOLLEY PERFORMANCE**      :
**PRODUCTS INC.,** *et al.,*[1]    :      **Case No. 09 – 13333 (PJW)**
                                 :
                   **Debtors.**    :      **(Jointly Administered)**
                                 :
------------------------------------------------------------------x

### MOTION FOR AN ORDER (A) ESTABLISHING BIDDING PROCEDURES; (B) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; AND (C) APPROVING THE SALE OF THE HOLLEY CLEAN POWER ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING THERETO

Holley Performance Products Inc. ("Holley"), on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby submits this motion (the "Motion") for an order (the "Order") (i) (a) authorizing bidding procedures to be employed in connection with the proposed sale (the "Asset Sale") of the Holley Clean Power original equipment manufacturer business (the "Product Line") and related assets (collectively, the "Purchased Assets") to Actuant Corporation ("Buyer") or another bidder submitting a higher or better offer at a proposed auction (the "Auction"); (b) authorizing a break-up fee and expense reimbursement in connection therewith; (c) scheduling an Auction and hearing to consider approval of the Asset Sale (the "Sale Hearing"); and (d) approving the form and manner of notice of this Motion and the Sale Hearing; and (ii) (a) approving that certain

---

[1] The Debtors are the following entities:  Holley Performance Products Inc., a Delaware corporation (EIN XX-XXX1482); Holley Performance Products Holdings, Inc., a Delaware corporation (EIN XX-XXX3923); Nitrous Oxide Systems, Inc., a Delaware Corporation (EIN XX-XXX0663); Weiand Automotive Industries, Inc., a Delaware Corporation (EIN XX-XXX6699); and Holley Performance Systems, Inc., a Delaware Corporation (EIN XX-XXX8014).  The Debtors' address is 1801 Russellville Road, Bowling Green, Kentucky 42101.

Asset Purchase Agreement dated November 23, 2009, between Holley and Buyer (the "Stalking Horse Purchase Agreement"), a true and correct copy of which is attached hereto and made a part hereof as Exhibit A, or an asset purchase agreement similar to the Stalking Horse Purchase Agreement or other offer submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving a sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests; (c) authorizing assumption and assignment of certain executory contracts; and (d) granting related relief.

## Jurisdiction and Venue

1.        This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

2.        On September 28, 2009 (the "Petition Date"), the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code.  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their business and manage their properties as debtors in possession.  No trustee, examiner, or creditors' committee has been appointed in the Debtors' chapter 11 cases.

3.        The Debtors are leading suppliers of high performance automotive products, including carburetors, fuel pumps, fuel injection systems, nitrous oxide injection

systems, superchargers, exhaust headers, mufflers, and automotive performance plumbing products, which are designed to enhance street, off-road, recreational, and competitive vehicle performance. The Debtors have a broad distribution network in the performance automotive aftermarket and a portfolio of widely recognized brand names. The Debtors' products are sold in the performance market aftermarket in all 50 states, Canada, and Europe. Major customers of the Debtors' high performance automotive products include such leading companies as Summit Racing Equipment, Jegs High Performance, Advance Auto Parts, AutoZone, GM Performance Parts, Ford Racing, and MOPAR.

4.      Further information regarding the Debtors, including the facts and circumstances regarding the commencement of these chapter 11 cases, is described in the Declaration of Thomas W. Tomlinson in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on September 27, 2009 [Dkt. No. 2] (the "<u>Tomlinson Declaration</u>").

### Purchase and Sale of the Product Line

5.      A significant part of Holley's business plan following its first chapter 11 case involved the growth of the Product Line - Holley's business selling to original equipment manufacturers. In particular, Holley entered into a business arrangement to supply emissions control components to Caterpillar Inc. ("<u>Caterpillar</u>") for use in their manufacturing of over-the-road diesel truck engines. In 2008, however, Caterpillar announced its intent to exit its over-the-road diesel truck engine business. Following this announcement, Caterpillar's sales quickly fell off and, as a result, the Product Line expected a similar sales decline.

6.      Holley began the process of finding a buyer for the Product Line in early 2009. To prevent continuing losses, Holley chose to shut down the Product Line in June 2009 and terminate the related employees. Holley, however, has continued limited production for two

Product Line customers who have agreed to fund Holley's cost of operations.

7.      Shortly before the Petition Date, the Debtors entered into a letter of intent to sell the Product Line to Buyer.  The Debtors continued negotiations with Buyer and have reached agreement for Buyer to serve as the "stalking horse" at an auction for the Purchased Assets pursuant to the Stalking Horse Purchase Agreement.

**Relief Requested**

8.      By this Motion, the Debtors seek entry of an order, substantially in the form of the order attached hereto as Exhibit B (the "Bidding Procedures Order"), authorizing and approving (i) the bidding procedures to be employed in connection with the proposed Asset Sale; (ii) (a) a break-up fee of $100,000 (the "Break-Up Fee") plus Buyer's reasonable out of pocket legal and other fees and expenses actually incurred by Buyer in connection with this transaction (the "Expense Reimbursement"), payable if the Court approves a sale to another bidder at the Auction and such sale closes, and (b) if the Stalking Horse Purchase Agreement is terminated other than by Seller due to Buyer's material breach, a payment to the Buyer of the Expense Reimbursement; (iii) scheduling the Auction and Sale Hearing; and (iv) approving the form and manner of notice of the Motion and the Sale Hearing.

9.      The Debtors further request that, at the Sale Hearing, the Court enter an order substantially in the form of Exhibit C hereto (the "Sale Order") (i) approving a sale to Buyer pursuant to the Stalking Horse Purchase Agreement or to another bidder submitting a higher or better offer (the "Successful Purchaser"), (ii) approving the Stalking Horse Purchase Agreement or a substantially similar asset purchase agreement with the Successful Purchaser, and (iii) authorizing the Debtors (a) to sell the Purchased Assets, free and clear of all liens, claims, encumbrances, and interests (other than certain specified assumed liabilities), and (b) to

assume and assign to the Successful Purchaser certain executory contracts associated with the Purchased Assets set forth on Schedule A to this Motion (the "Assigned Contracts").

## A.    The Proposed Sale to Buyer

10.    On November 23, 2009, Holley and Buyer entered into the Stalking Horse Purchase Agreement, subject to higher and better offers and the approval of this Court.  Pursuant to the Stalking Horse Purchase Agreement, Buyer has offered to purchase the Purchased Assets for a purchase price of $3,100,000.

11.    Below is a summary of material provisions of the Stalking Horse Purchase Agreement.  The summary is intended solely to give the Court and interested parties an overview of the material terms of the Stalking Horse Purchase Agreement.  Interested parties should refer to the Stalking Horse Purchase Agreement for the complete terms thereof.  To the extent that any inconsistency exists between this Motion and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control.

a)  Purchase Price.  $3,100,000 plus assumed liabilities.

b)  Purchased Assets.  Assets related to the Product Line, including copyrights, patents, customer records, machinery, inventory, and equipment, and certain assigned contracts.

c)  Excluded Assets.  Assets excluded from Purchased Assets include (a) cash and cash equivalents on hand as of the Closing, (b) the Debtors' facility in Bowling Green, Kentucky, (c) contracts other than the Assigned Contracts, (d) accounts receivable, and (e) Holley's brand name.

d)  Assumed Liabilities.  Buyer assumes certain cure obligations and post-closing obligations with respect to Assigned Contracts.

e)  Deposit.  $200,000 cash deposit (currently held by Ropes & Gray LLP in an escrow account).

f)  Requested Findings as to Successor Liability.  The proposed Sale Order contains findings of fact and conclusions of law limiting Buyer's successor liability.

g) <u>Bankruptcy Court Approval</u>.  The sale is conditioned upon entry an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Holley and Buyer, that authorizes the Asset Sale free and clear of liens, claims, encumbrances, and interests and finds that Buyer is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

h) <u>Sale Free and Clear</u>.  The sale of the Purchased Assets will be free and clear of all liens, claims, encumbrances, and other interests.

i) <u>Interim Operating Agreement</u>.  The sale is conditioned upon Holley's entry into an interim operating agreement to service the Product Line after the Closing for up to six months.

j) <u>Termination</u>.  Buyer may terminate the Stalking Horse Purchase Agreement as set forth therein, including (i) if the Bidding Procedures Order is not entered by 20 days following the date hereof, (ii) if the Sale Order is not entered by 45 days following the date hereof, or (iii) after ten business days following the entry of the Sale Order, if the Closing has not occurred other than as a result of Buyer's material breach.

12. The Stalking Horse Purchase Agreement does not include a separate purchase price adjustment for Holley's inventory.

**B.** **The Bidding Procedures**

13. The Stalking Horse Purchase Agreement requires entry of a bidding procedures order in the form of the Bidding Procedures Order, or otherwise reasonably satisfactory to Holley and Buyer.

14. The proposed Bidding Procedures Order provides that Holley will pay (a) the Break-Up Fee and the Expense Reimbursement, as described above, if the Court approves a sale to another bidder at the Auction and such sale closes, and (b) the Expense Reimbursement if the Stalking Horse Purchase Agreement is terminated other than by Seller due to Buyer's material breach.

15. Pursuant to the Bidding Procedures Order, any counteroffer (a "<u>Counteroffer</u>") must contain the following <u>non-waivable requirements</u>:

a) Any Counteroffer shall provide for (i) a purchase price with a minimum cash component payable at closing of $3,300,000, (ii) a good faith deposit by wire transfer, certified or cashier's check, in the amount of ten percent (10%) of the initial bid to be held in escrow, (iii) an executed confidentiality agreement, (iv) an executed asset purchase agreement and one copy marked to show any changes from the Stalking Horse Purchase Agreement, and (v) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and payment of the purchase price in cash at the Closing

b) Each subsequent bid must be at least $100,000 greater than the preceding bid.

      16.     The Bidding Procedures Order may contain the following additional

requirements for counteroffers, *provided* that Holley, in its sole discretion exercised in good

faith, may waive any of these requirements:

a) Any Counteroffer shall be in writing and be served on counsel to the Debtors, Ropes & Gray LLP, One International Place, Boston, Massachusetts 02110-2624, Attn: James. M. Wilton and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, DE 19899-1709, Attn: David B. Stratton, so as to be received on or before 12:00 noon (Prevailing Eastern Time) three business days prior to the first scheduled date of the Auction (the "Bid Deadline").

b) The cash deposit delivered in connection with the Counteroffer shall be delivered to Ropes & Gray LLP, by certified check or wire transfer, so as to be received on or before the last business day prior to the first scheduled date of the Auction.

c) The entity submitting a Counteroffer shall enter into joint escrow instructions with Holley and Ropes & Gray LLP regarding the deposit delivered in connection with such Counteroffer.

d) Buyer may credit bid the amount of the Break-Up Fee at the Auction.

e) The terms and conditions of the Counteroffer must be, in aggregate, not materially more burdensome to Holley than provisions contained in the Asset Purchase Agreement.

f) Any bidder submitting a Counteroffer shall demonstrate to Holley's satisfaction in Holley's sole discretion that it is (a) financially able to consummate the transactions contemplated by the Counteroffer, which ability may be demonstrated by submission of bank statements, current audited or unaudited financial statements, or other reasonable evidence, or, if the bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited or unaudited financial statements or other reasonable evidence of the financial capability of the equity holders of the bidder, and (b) able to consummate the transaction on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement.

g)  The Auction will take place at 10:00 a.m. two business days prior to the date of the Sale Hearing at the offices of Ropes & Gray LLP, One International Place, Boston, Massachusetts.

h)  The Debtors will send notice by electronic mail to the Core Notice Parties and counsel to any entity that has submitted a Counteroffer if the date, time, or place of the Auction changes.

i)  The Debtors and its professionals will direct and preside over the Auction.

j)  At the Auction, the Debtors may announce additional procedural or bidding rules for the Auction so long as the rules are not inconsistent with these Bid Procedures.  The Debtors shall maintain a transcript of all bids made and announced at the Auction.

k)  Each bidder participating at the Auction will certify on record at the commencement of the Auction that it has not and will not engage in any collusion with respect to the bidding or the sale.

l)  The Debtors will continue the Auction until there is only one bid that the Debtors determine, in their sole discretion exercised in good faith, is the highest or otherwise best bid for the Purchased Assets.

m)  Each subsequent bid at the Auction must comply with the requirements for a Counteroffer set forth herein and be at least $100,000 greater than the preceding bid.

## C.  **Notice**

17.  To ensure that adequate notice of the Asset Sale is provided, Holley seeks approval of a form of Notice of Sale attached hereto as Exhibit D (the "Notice of Sale").

18.  Within two business days following entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures Order and the Notice of Sale upon: (a) the Office of the United States Trustee for the District of Delaware (the "US Trustee"); (b) counsel to the Indenture Trustee for the Debtors' 12 ½% Senior Second Lien Secured Notes due 2013 (the "Indenture Trustee"); (c) counsel to Wells Fargo Foothill, Inc.; (d) the creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis; (e) all parties known to have asserted liens against the Purchased Assets; (f) federal and state taxing authorities' offices which have a reasonably known interest in the relief requested in the

Motion; (g) counsel to the Buyer; (h) counsel to the Majority Secured Noteholders (as defined in the Tomlinson Declaration); and (i) all parties who have filed notices of appearance requesting service of notices and pleadings in this case and any party that has expressed an interest in a transaction with respect to the Purchased Assets within the last twelve months. In addition, within two business days of the entry of the Bidding Procedures Order, the Debtors will serve a copy of the Notice of Sale upon all other creditors and other persons entitled to notice under Bankruptcy Rule 2002(a).

19.     Within two business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures Order and a notice of the assumption and assignment of the Assigned Contracts substantially in the form attached hereto as <u>Exhibit E</u> upon all non-debtor parties to Assigned Contracts.

20.     The Debtors submit that each of the foregoing notices provides the recipient with ample notice of the relief requested, the relative impact that such relief may have on the recipient, and the procedures that a recipient must follow if such recipient wishes to respond, participate in the Auction, or otherwise object to the relief requested, as the case may be. The Debtors submit that the foregoing notices therefore constitute good and sufficient notice of the Bidding Procedures, the Sale Hearing, the assumption and assignment of the Assigned Contracts, this Motion, and all relief contemplated thereby.

**Basis for Relief**

**A.    The Asset Sale is Within the Debtors' Sound Business Judgment**

21.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).  Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

22.    A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business justification exists for the sale.  Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983).  In considering a debtor's business decision, the court does not act as an arbiter of disputes between creditors and the estate, but rather as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

23.    Courts have applied various factors in determining whether a sound business justification exists, including that: "(1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the

purchaser has acted in good faith." In re Decora Indus., Inc., 2002 WL 32332749 at *2 (D. Del.

2002); see In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991).

24.     The proposed Asset Sale pursuant to the Stalking Horse Purchase

Agreement (as may be modified at the Auction) is supported by sound business justifications.

The Debtors firmly believe that creditors will receive more value through a prompt sale of the

Purchased Assets than through continued operations and that a prompt sale is necessary to

maximize the value of the Purchased Assets for the estate.

(i)     Sound Business Reasons Exist for the Asset Sale
        and the Consideration Offered is Fair and Reasonable

25.     The Debtors have determined that the Asset Sale according to the

proposed Bidding Procedures will enable the Debtors to obtain the highest and best offers for the

Purchased Assets and maximize the value of the Purchased Assets for the estate.  As discussed

above, the Debtors shut down the Product Line prior to the Petition Date as a cost-cutting

measure and have only been continuing production in a limited form for customers willing to

fund the Debtors' costs of operations.  The Debtors have determined, in their reasonable business

judgment, that the Purchased Assets will have the greatest value if sold while the Product Line's

operations, albeit limited, are continuing.  The Debtors have therefore concluded that a prompt

sale of the Purchased Assets will best maximize value.

26.     The Debtors marketed the Product Line extensively prior to the Petition

Date to the most likely possible buyers and have continued to solicit offers for the Purchased

Assets postpetition.  Of the offers received, the Debtors ultimately considered Buyer's offer to be

the highest and best offer and accepted Buyer's offer to serve as the "stalking horse" at an

auction of the Purchased Assets.  Pursuant to the proposed Bidding Procedures, the Debtors will

continue to market the Product Line up to and during the Auction, ensuring that the Debtors will

receive the highest and best offer for the Product Line, whether from Buyer or from another

successful bidder.  Accordingly, the Debtors submit that the Asset Sale will provide fair and

reasonable consideration.

(iii)    <u>The Debtors Have Presented the Proposed Asset Sale in Good Faith</u>

27.    The Stalking Horse Purchase Agreement requires as a condition to closing

that the Sale Order include a finding that the successful bidder is a good faith purchaser within

the meaning of section 363(m) of the Bankruptcy Code.  The Debtors have fully disclosed and

requested the Court's approval of all of the terms and conditions of the proposed sale and intend

to provide notice as directed by the Court.  Furthermore, the Debtors will be prepared to

introduce evidence at the Sale Hearing regarding the conduct of the Auction and the arms length

nature of the negotiation of the Stalking Horse Purchase Agreement or another asset purchase

agreement with a bidder submitting a higher and better bid.  Accordingly, the Asset Sale

pursuant to the Stalking Horse Purchase Agreement or such other asset purchase agreement has

been proposed, and is, in good faith.

(iv)    <u>Adequate Notice of the Asset Sale is Being Provided</u>

28.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside

of the ordinary course of business may be by private sale or by public auction.  Further, pursuant

to Bankruptcy Rule 2002, twenty day notice by mail is sufficient notice of the proposed use, sale,

or lease of property of the estate other than in the ordinary course of business.  Subject to

Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under

Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and

conditions of any private sale, and the time fixed for filing objections.  <u>See</u> Fed. R. Bankr. P.

2002(c)(1).  Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property.  Id.

29.     The Debtors respectfully submit that the notice, procedures, and rules set forth in the Motion satisfy the notice requirements of the Bankruptcy Rules and section 363(b) of the Bankruptcy Code and constitute good and sufficient notice, and that no other or further notice is required.

**B.     <u>The Break-Up Fee and Expense Reimbursement are Warranted</u>**

30.     To compensate Buyer for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtors seek authority to pay Buyer the Break-Up Fee and the Expense Reimbursement if the Court approves a sale of the Purchase Assets to another bidder and such sale closes.  The Debtors also seek authority to pay Buyer the Expense Reimbursement if the Stalking Horse Purchase Agreement is terminated for any reason other than by Seller due to Buyer's material breach.  The Break-Up Fee and Expense Reimbursement, when earned, will constitute administrative claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

31.     Bidding incentives such as a break-up fee or expense reimbursement encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  The proposed Break-up Fee and Expense Reimbursement are reasonable, given the benefits to the estates of having the Stalking Horse Purchase Agreement as a definitive agreement and the risk to Buyer that a third-party offer ultimately may be accepted.  Accordingly, the Break-Up Fee and Expense Reimbursement are necessary to preserve and enhance the value of the Debtors' estates.

32.     The United States Court of Appeals for the Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court found that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate.  See id. at 533.

33.     The O'Brien court identified at least two instances in which bidding incentives benefit the estate.  First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

34.     The Break-Up Fee and Expense Reimbursement satisfy this standard.  The Stalking Horse Purchase Agreement, and in particular the Break-Up Fee and Expense Reimbursement, are the product of good faith, arm's-length negotiations.  The Break-Up Fee and Expense Reimbursement are fair and reasonable in amount, particularly in view of Buyer's efforts to date and the risk to Buyer of not acquiring the Purchased Assets.  Further, the Break-Up Fee and Expense Reimbursement already have encouraged competitive bidding, in that Buyer would not have entered into the Stalking Horse Purchase Agreement without these provisions.  The Break-Up Fee and Expense Reimbursement thus have "induc[ed] a bid that

otherwise would not have been made and without which bidding would [be] limited." <u>Id.</u>
Similarly, Buyer's offer provides a minimum bid on which other bidders can rely, thereby
"increasing the likelihood that the price at which the [Purchased Assets will be] sold will reflect
[their] true worth." <u>Id.</u>  Finally, the mere existence of the Break-Up Fee and Expense
Reimbursement permits Holley to insist that competing bids for the Assets be materially higher
or otherwise better than Buyer's bid, a clear benefit to the Debtors' estates.

   35. In sum, Holley's ability to offer the Break-Up Fee and Expense
Reimbursement enables the Debtors to ensure that the sale of the Purchased Assets will be to a
contractually-committed bidder at a price the Debtors believe to be fair.  At the same time, the
Break-Up Fee and Expense Reimbursement provide the Debtors with the potential of even
greater benefit to the estate.  Accordingly, the Break-Up Fee and Expense Reimbursement
should be approved.

**C.** <u>**Assumption and Assignment of Executory Contracts**</u>

   36. The Debtors also seek authority to assume and assign the Assigned
Contracts to Buyer.  Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the
court's approval, may assume or reject any executory contract or unexpired lease of the debtor."
11 U.S.C. § 365(a).  Section 365(f)(2), however, provides that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor only if –
>
> > (A) the trustee assumes such contract or lease in
> > accordance with the provisions of this section; and
> >
> > (B) adequate assurance of future performance by the
> > assignee of such contract or lease is provided, whether or
> > not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

37.     Section 365(b)(1) in turn codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing:

> (b) (1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee –
>
>> (A)     cures, or provides adequate assurance that the
>> trustee will promptly cure, such default . . . ;
>>
>> (B)     compensates, or provides adequate assurance that
>> the trustee will promptly compensate, a party other than the
>> debtor to such contract or lease, for any actual pecuniary
>> loss to such party resulting from such default; and
>>
>> (C)     provides adequate assurance of future performance
>> under such contract or lease.

11 U.S.C. § 365(b)(1).

38.     The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic construction."

EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),

139 B.R. 585, 592 (S.D.N.Y. 1992); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr.

S.D. Fla. 1994) ("the degree of assurance necessary falls considerably short of an absolute

guaranty"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538

(Bankr. D.N.J. 1988).

39.     Among other things, adequate assurance may be provided by

demonstrating the assignee's financial health and experience in managing the type of enterprise

or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

(adequate assurance of future performance is present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding).

40. Under the Stalking Horse Purchase Agreement, Buyer has agreed to cure all defaults under the Assigned Contracts, thereby providing adequate assurance that the trustee will promptly cure any default under an Assigned Contract pursuant to Code section 365(b)(1)(B). Additionally, the Debtors will adduce facts at the Sale Hearing to show the financial wherewithal of Buyer's or the successful bidder's experience in the industry and its willingness and ability to perform under the contracts to be assumed and assigned to it. The Sale Hearing will therefore provide the Court and the other interested parties the opportunity to evaluate and, if necessary, challenge the ability of Buyer or the successful bidder to provide adequate assurance of future performance under the contracts to be assumed, as required under section 365(b)(1)(C). The Court should therefore authorize Holley to assume and assign contracts as set forth herein.

41. The Debtors also request that the Court bar non-debtor parties to executory contracts assumed and assigned in the Asset Sale from (i) asserting any default, loss, or liability against the assignee of such contract based on any event or circumstance arising prior to the date of assignment, or (ii) objecting to the assumption and assignment of its contract, unless the non-debtor party timely objects to this Motion.

**D.    Authorization for Sale Free and Clear of
Liens, Claims, Encumbrances, and Interests**

42. Section 363(f) of the Bankruptcy Code provides that a debtor may sell property "free and clear of any interest in such property of an entity other than the estate, only if

a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b)    such entity consents;

c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

<blockquote>

d)        such interest is in bona fide dispute; or

e)        such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

</blockquote>

11 U.S.C. § 363(f); see In re Kellstrom Industries, Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met). Holley anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f) with respect to any party asserting an interest in the Purchased Assets. Specifically, Holley proposes that any liens, claims, or encumbrances asserted against the Purchased Assets be transferred to any proceeds realized from the sale of such assets, in compliance with any interim or final cash collateral orders entered in these cases. Accordingly, a sale free and clear of liens, claims, and interests is permitted under section 363(f).

<h3 align="center">Notice</h3>

43.      No trustee, examiner, or creditors' committee has been appointed in the Debtors' chapter 11 cases. Notice of this Motion has been provided to: (i) the US Trustee; (ii) counsel to Wells Fargo Foothill, Inc.; (iii) counsel to the Indenture Trustee; (iv) counsel to the Majority Secured Noteholders; (v) the Debtors' thirty largest unsecured creditors (on a consolidated basis); and (vi) all other parties required to receive service under Local Rule 2002-1(b). In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

44.      As provided in Bankruptcy Rule 6004(h) and 6006(d), the order establishing Bid Procedures shall not be stayed for ten days after entry by the Court and shall be effective and enforceable immediately upon entry by the Court.

## No Prior Request

45.     The Debtors have not previously sought the relief requested herein from this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter (i) an order in the form attached hereto as Exhibit B (a) authorizing bidding procedures to be employed in connection with the Asset Sale of the Purchased Assets to Buyer or another bidder submitting a higher or better offer at the Auction; (b) authorizing the Break-Up Fee and Expense Reimbursement; (c) scheduling an Auction and the Sale Hearing; and (d) approving the form and manner of notice of the Motion and the Sale Hearing; and (ii) an order in the form attached hereto as Exhibit C (a) approving the Stalking Horse Purchase Agreement, a true and correct copy of which is attached hereto and made a part hereof as Exhibit A, or an asset purchase agreement similar to the Stalking Horse Purchase Agreement submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving a sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests; (c) authorizing assumption and assignment of certain executory contracts; and (d) granting related relief.

Dated:  November __, 2009
      Wilmington, Delaware

Respectfully submitted,
 PEPPER HAMILTON LLP

/s/ Evelyn J. Meltzer
David B. Stratton (DE No. 960)
Evelyn J. Meltzer (DE No. 4581)
John A. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel:   302.777.6500
Fax:   302.421.8390

-AND-

Ropes & Gray LLP
James M. Wilton (*pro hac vice*)
James A. Wright III (*pro hac vice*)
Jonathan B. Lackow (*pro hac vice*)
One International Place
Boston, MA 02110-2624
Tel:    617.951.7000
Fax:    617.951.7050

*Attorneys for the Debtors*
*and Debtors in Possession*

23718372_9.DOC

#11756232 v1

## SCHEDULE A

### Assigned Contracts

| Counterparty | Description | Notice Address |
|---|---|---|
| Siamak Attar-seyedi | Confidentiality and Non-Competition Agreement | 323 Tall Meadow Lane, Yardley PA 19067 |
| Jared Brandt | Confidentiality and Non-Competition Agreement | 320 Montague Avenue, Franklin, KY 42134 |
| Nigel Janes | Confidentiality and Non-Competition Agreement | 45 Sterling Way, Bowling Green, KY 42101 |